Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL I

| | | |
|---|---|---|
| IVÁN PÉREZ PADÍN<br><br>Apelante<br><br>YADIRA RIVERA ADORNO<br><br>Apelada<br><br>EX PARTE | KLAN202401074 | *Apelación*<br>procedente del<br>Tribunal de Primera<br>Instancia, Sala<br>Superior de<br>San Juan<br><br>Caso Núm.<br>K DI2013-1636<br>(704)<br><br>Sobre:<br>Pensión Excónyuge |

Panel integrado por su presidente, el Juez Sánchez Ramos, el Juez Pagán Ocasio y el Juez Rodríguez Flores.

Sánchez Ramos, Juez Ponente

## SENTENCIA

En San Juan, Puerto Rico, a 30 de junio de 2025.

Luego de una vista evidenciaria, el Tribunal de Primera Instancia ("TPI") denegó una solicitud de relevo de una pensión de excónyuge que las partes estipularon y que fue acogida por el TPI al dictar una sentencia de divorcio por consentimiento mutuo. Según explicamos en detalle a continuación, concluimos que la prueba sostiene lo actuado por el TPI, pues no se alegó un cambio sustancial en la capacidad del apelante y no se demostró un cambio sustancial en las necesidades de la apelada.

I.

El Sr. Iván Pérez Padín (el "Exesposo" o el "Apelante") y la Sra. Yadira Rivera Adorno (la "Exesposa" o la "Apelada") contrajeron matrimonio el 1 de junio de 1991. Se divorciaron por consentimiento mutuo en el 2013.

La sentencia de divorcio acogió las estipulaciones que sometieron las partes para dividir la comunidad postganancial. En lo atinente a la controversia que nos ocupa, el Exesposo se obligó a pagar $2,500.00 mensuales, por concepto de pensión alimentaria

excónyuge y a sufragar los gastos universitarios del hijo de ambos.[1]

También se obligó a pagarle a la Exesposa un plan médico.[2]

A su vez, de acuerdo con la *Minuta* que recoge las incidencias de la vista de divorcio, el Exesposo compareció con representación legal, mientras que la Exesposa compareció por derecho propio. Asimismo, en la *Minuta* se indicó que el Exesposo se comprometió a satisfacer la pensión excónyuge de manera indefinida.[3]

Casi cinco años luego, el 12 de junio de 2018, el Exesposo presentó una *Moción Asumiendo Representación Legal y en Solicitud para que se Elimine Pago de Pensión Ex Cónyuge (sic).* Sostuvo que la Exesposa no tenía una necesidad económica que la hiciera acreedora de una pensión de alimentos entre excónyuges, según establecido en el Artículo 109 del Código Civil de 1930, 31 LPRA ant. sec. 385, vigente en ese momento.[4]

En específico, el Exesposo arguyó que, a raíz de la liquidación de la sociedad legal de gananciales, la Exesposa fue acreedora de una suma líquida de $152,292.49 y de una residencia que adeudaba, en ese momento, $64,990.77 por concepto de préstamo hipotecario. Afirmó que la Exesposa no reunía los requisitos del precitado Artículo 109 del Código Civil. Añadió que la Exesposa generaba ingresos propios y que contaba con un grado de bachillerato en recursos humanos. Por ende, sostuvo que la

---

[1] En específico, las partes estipularon lo siguiente:
Pensión alimentaria
El co peticionario Iván Pérez Padín se obliga a pagar la suma de $2,500.00 mensuales por concepto de pensión alimentaria, en concepto de pensión excónyuge. En adición se hará cargo de todos los gastos de la educación del hijo de las partes, incluyendo matrícula universitaria, cuotas, y demás gastos de estudios, incluyendo libros. Véase, *Sentencia*, Apéndice I del recurso de apelación, pág. 2.
[2] Según la *Sentencia* de divorcio, el Exesposo se obligó a lo siguiente:
Otros Asuntos
1. El co peticionario se obliga a proveer plan médico con cubierta para la co-peticionaria una vez ésta sea dada de baja del plan médico actual. *Íd.*, a la pág. 5.
[3] En la Minuta consta lo siguiente: El señor Pérez, pasará la cantidad de $2,500.00 mensuales de pensión ex cónyuge de forma indefinida a la señora Rivera Adorno. Véase, *Minuta*, Apéndice 2 del *Alegato en Oposición*, pág. 27.
[4] Haremos referencia al Código Civil de 1930 por estar vigente al momento de los hechos que originan el pleito de autos.

Exesposa no tenía necesidad económica alguna que justificara la continuación de la referida pensión.

Por su parte, el 15 de noviembre de 2018, la Exesposa instó una *Moción en Oposición a Solicitud de Relevo de Pensión Alimentaria Excónyuge; y Solicitud de Aumento de Pensión Excónyuge*. En síntesis, planteó que la pensión excónyuge (la "Pensión") fue producto de una estipulación de divorcio. Por lo tanto, sostuvo que el Art. 109 del Código Civil, *supra*, no aplicaba a la controversia. Por otro lado, afirmó que no generaba un ingreso como tal, sino que vendía prendas y productos de *Mary Kay*, de lo cual generaba un ingreso de $75.00 mensuales, aproximadamente. Añadió que sus gastos mensuales ascendían a más de $3,900.00 y que, luego de la división de los bienes gananciales, disponía de una liquidez de $14,000.00. Explicó que el aumento en sus gastos se debía a varias condiciones médicas que le fueron diagnosticadas con posterioridad al divorcio. Además, sostuvo que, a partir de enero de 2018, el Exesposo dejó de pagar la cubierta de su plan médico, a pesar de haberse obligado a hacerlo. Consecuentemente, la Exesposa asumió los gastos médicos.

La Exesposa también arguyó que no se había demostrado que hubiesen ocurrido cambios económicos sustanciales que justificaran el relevo de la Pensión. Solicitó un aumento de pensión a $5,000.00 y un reembolso de $2,468.73, correspondiente a los gastos médicos.

El 7 de diciembre de 2018, el TPI notificó una *Resolución* mediante la cual acogió la solicitud de relevo de la Pensión.

Inconforme, la Exesposa presentó un recurso de apelación ante este Tribunal (KLAN201900224). Mediante una *Sentencia* de 31 de julio de 2019, este Tribunal revocó la *Resolución* apelada y ordenó al TPI la continuación de los procedimientos. En lo pertinente al recurso de referencia, se dispuso lo siguiente:

[...] Sin embargo, en este caso, **correspondía al Sr. Pérez aducir y probar un cambio sustancial en sus recursos como alimentante, o en las necesidades económicas de la alimentista apelante**. Meras alegaciones respecto a supuestos ingresos y a la presunta falta de necesidad de la alimentista no pueden ser suficientes para relevar a una parte de cumplir con el derecho fundamental a los alimentos.

Aquí, el foro apelado no celebró una vista para dilucidar si procedía el relevo de la pensión excónyuge, sino que dio por buenas las alegaciones del apelado. Tampoco evaluó el aumento de la pensión que solicitó la apelante. Por tanto, las partes litigantes no tuvieron oportunidad de presentar evidencia para sustentar sus respectivas posturas. (Énfasis provisto).

Continuados los procedimientos ante el TPI, la vista en su fondo se celebró los días 12 de abril de 2021; 7 y 27 de mayo de 2021; 21 y 22 de junio de 2021; 30 de agosto de 2021; 9 de noviembre de 2021; 8 de febrero de 2022; 17 de marzo de 2022; 2 y 26 de abril de 2022; 1 de julio de 2022; 8 de agosto de 2022; 17 de octubre de 2022; y 15 y 30 de noviembre de 2022. Subsiguientemente, las partes sometieron memorandos de derecho en apoyo a sus respectivas posturas.

Mediante una *Resolución* notificada el 20 de agosto de 2024 (la "Sentencia"), el TPI denegó la solicitud de relevo de la Pensión. El TPI formuló las siguientes determinaciones de hechos (énfasis suplido):

1. Las partes contrajeron matrimonio el 1 de junio de 1991. El Sr. Pérez Padín tenía 33 años y la Sra. Rivera Adorno 20.

2. El 19 de diciembre de 1991 procrearon a su hijo Iván Pérez Rivera.

3. El Sr. Pérez Padín se desempeña como corredor de seguros desde el 1996.

4. Trabajó con las compañías *Barrios y Carrión* y después con *Alexander y Alexander* (luego *AOR Services*).

5. En el 2011 fundó Alternative Insurance, Inc. donde trabaja hoy día.

6. Cuando las partes contrajeron matrimonio, la Sra. Rivera Adorno era estudiante universitaria de Recursos

Humanos y el alimentante era prestamista y vendedor de prendas.

7. Eventualmente el Sr. Pérez Padín le cedió el negocio de venta de prendas a la alimentista. Este negocio deja un margen de ganancias de 50%.

8. Las partes se separaron en el 2007, luego de 16 años de convivencia matrimonial.

9. Durante la convivencia del matrimonio, es decir desde el 1991 hasta el 2007, la Sra. Rivera Adorno no trabajó fuera del hogar, aunque mantenía el negocio de venta de prendas y fungía como una especie de "gestora" de una clienta del Sr. Pérez Padín, la Sra. Sara Chiesa,[5] quien le pagaba $10 por hora.

10. No fue hasta el 2013 que las partes finalmente se divorciaron.

11. **La Sra. Rivera Adornó declaró que la pensión ex cónyuge se estipuló con la condición de que ella no reclamara ningún interés en Alternative Insurance, Inc. la empresa de seguros fundada por el alimentante y que era de naturaleza ganancial.**

12. Indicó el Sr. Pérez Padín que los $2,500 que luego se pactaron como pensión ex cónyuge él se los estaba aportando a la alimentista desde que se separaron, es decir, seis años antes de divorciarse.

13. Cuando el Sr. Pérez Padín solicito el relevo de pensión, la alimentista le envió una carta en la cual le pedía que "pospusiera" el proceso de solicitud de relevo por lo menos un año, hasta que el hijo de las partes se graduara de universidad. El joven residió con la Sra. Rivera Adorno mientras cursaba estudios universitarios.

14. Desde el año 2018, cuando solicitó el relevo de pensión, el alimentante cesó los pagos de pensión a la Sra. Rivera Adorno. También dejó de proveer el plan médico.

15. La alimentista vende Mary Kay desde el 2015 para suplementar sus ingresos. Declaró que recibe el 4% de las ventas de las consultoras que tiene a su cargo.

16. A estos efectos se admitieron en evidencia los *Income Advisory Statements* de Mary Kay para los años 2015 al 2019 de la Sra. Rivera Adorno[6] de los cuales el inciso *Total of Comissions, Prizes, Awards and Other* refleja por año las siguientes cantidades:

    a. 2015 - $78.83
    b. 2016 - $122.11
    c. 2017 - $181.28

---

[5] Nota al calce en el original: [l]a llevaba a las citas médicas, iba al correo, etc. También trabajó con la Sra. Luz Guerra en labores similares.
[6] Nota al calce en el original: [v]éase Exhibit 9 del Sr. Pérez Padín.

d. 2018 - $142.85
e. 2019 - $36.30

17. **Actualmente la Sra. Rivera Adorno cuenta con los siguientes activos**:

a. $43,265.72 del plan 401K
b. $833.45 de balance en una Multicuenta Popular
c. $421. 51 de balance en una cuenta en Caribbean Federal
e. Dos IRAS de $52,254.96 y $37,386.75
f. Propiedad en Villa Nevárez

18. La Sra. Rivera Adorno ya era madre de su hijo Iván cuando finalmente terminó sus estudios universitarios.

19. A pesar de que está estipulado en la sentencia de divorcio que el alimentante le proveería el plan médico, desde el 2018 la Sra. Rivera Adorno tuvo que pagar $223 mensuales de plan médico porque el alimentante dejó de proveérselo. **En enero de 2019 se acogió al plan Vital de la reforma de Salud**.

20. **Desde abril de 2019 recibe $113 mensuales de los beneficios del PAN**.

21. La Sra. Rivera Adorno viajaba frecuentemente a Florida, y que su mamá y hermanos residen allá.

22. Luego del Huracán María estuvo un tiempo con su familia en Florida y realizó un viaje en crucero. Regresó a Puerto Rico en enero de 2018.

23. La alimentista también tomó unas vacaciones en un resort en dicho estado y viajó a Nueva York a ver a un primo.

24. Aunque no está incapacitada, no se ha planteado buscar un trabajo. Para cubrir sus gastos, en el 2020 retiró $10,000.00 de una de sus cuentas IRA, aprovechando unos incentivos otorgados en ocasión de la pandemia de Covid-19.

25. Costea sus viajes con dinero ahorrado y recibido después del divorcio.

26. En septiembre de 2017 retiró $5,000 de una de sus cuentas para tener dinero en efectivo luego del paso del Huracán María.

27. Paga todos sus gastos (compra, gastos médicos, luz, agua, etc.) con la tarjeta de crédito Visa.

28. **El Sr. Pérez Padín reside en una propiedad en Parque Forestal junto a su esposa actual, con quien contrajo nupcias en el 2018. Hasta el 2019 vivió en la casa en la Urb. Sabanera en Gurabo que se le adjudicó en el divorcio.**

29. La propiedad de Parque Forestal costó $425,000 de los cuales $250,000 se financiaron y $168,000 se aportaron en efectivo.

30. El alimentante alegó que dicha cantidad provino de dividendos que le pagó Alternative Insurance, Inc., más un préstamo que le hizo a la corporación y que está repagando. Se hizo un cheque de Alternative Insurance, Inc., y se le entregó al banco. Su actual esposa no aportó dinero a dicha compraventa.

31. **El Sr. Pérez Padín tiene un ingreso de $6,134 mensuales, más un "allowance" de $1,000 mensuales para un total de $7,134 al mes. No tiene ninguna otra fuente de ingresos.**

32. Viaja dos veces al año. En el 2017 viajó en crucero y fue a Florida a jugar golf con clientes y amistades. También vacacionó en AirBnBs en Rincón. En el 2018 también viajo, pero no recuerda a dónde. También viajó a Alemania y a Francia.

33. Antes de comprar la casa de Parque Forestal, le alquiló a su cuñada un apartamento por $600 mensuales por el término de un año aproximadamente.

34. Su plan médico lo paga Alternative Insurance, Inc.

35. Aunque en alguna ocasión el Sr. Pérez Padín le pidió a la alimentista que buscara trabajo, la Sra. Rivera Adorno se mantuvo encargada del hogar y del hijo. No hubo presión del alimentante para que trabajara.

36. Desde octubre de 2020 **la alimentista reside en el apartamento de su hermano en Miami, porque aquí en Puerto Rico el dinero no le alcanza para cubrir sus gastos.**

37. **Se graduó de universidad cuando su hijo tenía 2 años y se mantuvo cuidando al niño y administrando el hogar.**

38. Igualmente, cuando las partes se separaron, ella se quedó en la casa atendiendo al hijo.

39. Cuando el menor cursaba los grados 10, 11 y 12 de escuela superior la Sra. Rivera Adorno le dio *home schooling.* El alimentista estuvo de acuerdo con esta decisión.

40. Desde mediados del 2019, ante la falta de liquidez, **empezó a pagar la hipoteca de la propiedad de Villa Nevárez con la tarjeta Visa**.

41. A partir del divorcio, la Sra. Rivera Adorno comenzó a sentir, entre otras cosas, falta de concentración, por lo cual comenzó a visitar a la Dra. Rosana Briseño quien le recomendó tomar suplementos. La consulta con la Dra. Briseño hay que pagarla, ya que no acepta planes médicos. Igual los suplementos, que no están cubiertos por el plan médico.

42. Alega que en el 2020 estuvo en una situación precaria por la pandemia, ya que no recibió beneficios del PUA.

43. En su casa había dos vehículos de motor, el suyo y el de su hijo.

En atención a estos hechos incontrovertidos, el TPI concluyó que el Exesposo no demostró la existencia de cambios sustanciales en las circunstancias de las partes que ameritaran el relevo de la Pensión. En particular, el TPI concluyó lo siguiente:

> ***En el momento que se pactó la pensión, el Sr. Pérez Padín conocía los activos que se le adjudicarían a la alimentista, así como el hecho de que ella no estaba incapacitada para trabajar y, aún así, estipuló la pensión.*** Por tanto, solo podemos concluir que en el 2018 **el Sr. Pérez Padín simplemente cambió de parecer con relación a la pensión que pactó** y por ello pretende ser relavado de su obligación. De hecho, a pesar de que el Tribunal de Apelaciones revocó el 31 de julio de 2019 la determinación del Tribunal de Primera Instancia relevándolo de la pensión ex cónyuge, ***dicha parte nunca reanudó los pagos***.[7]

Inconforme, el 3 de septiembre, el Exesposo solicitó la reconsideración de la Sentencia. Oportunamente, la Exesposa se opuso a dicha solicitud. Mediante un dictamen notificado el 1 de noviembre, el TPI denegó la solicitud de reconsideración del Exesposo.

En desacuerdo, el 2 de diciembre (lunes), el Exesposo presentó el recurso de apelación de referencia; formuló los siguientes cinco (5) señalamientos de error:

A. Primer Error: Erró el Honorable TPI, al no revocar la pensión alimentaria excónyuge determinando que la apelada tenía necesidad económica, en contravención a la prueba y determinaciones de hechos realizadas.

B. Segundo Error: Erró el Honorable TPI, al no revocar la pensión alimentaria excónyuge a pesar de que sí determinó que la pensión no era indefinida, sino que tenía fecha de expiración.

C. Tercer Error: Erró el Honorable TPI, al no revocar la pensión alimentaria excónyuge a pesar de que sí hubo un cambio de circunstancias.

---

[7] Véase, *Resolución*, Apéndice VII del recurso de apelación, pág. 114.

D. Cuarto Error: Erró el Honorable TPI, al no incluir en sus determinaciones de hechos y al no tomar en cuenta el hecho no controvertido que la Apelada reside en la Florida desde el 2020 con familiares que, según ella, le cubren sus necesidades básicas.

E. Quinto Error: El TPI le violentó el debido proceso de ley al Apelante.

El Apelante enfatizó que ya su hijo había terminado de estudiar; que la Apelada vive con familiares desde octubre de 2020; que los ingresos y activos de la Apelada demostraban que no tenía necesidad económica; y que, de todas maneras, la Apelada tiene capacidad para trabajar.

Una vez presentada la transcripción estipulada de la prueba oral, el Exesposo presentó, a finales de mayo, un *Alegato Suplementario.*

Por su parte, el 25 de junio, la Exesposa presentó su alegato en oposición. Resaltó que, a cambio del compromiso del Apelante en cuanto a la Pensión, accedió a que este obtuviese "el 100% de su participación en Alternative Insurance, Inc.", y a recibir una cuantía que "no constituía el 50% del valor del negocio". Arguyó que eran "mínimos" los ingresos que recibía por "ventas de prendas" y productos *Mary Kay.* Resaltó que, si bien vivía con familiares, ello era resultado, precisamente, de que el Apelante, desde hace varios años, no paga la Pensión. Resolvemos.

## II.

Los alimentos entre excónyuges están reglamentados por el Artículo 109 del Código Civil[8], 31 LPRA ant. sec. 385, el cual establece, en lo pertinente, lo siguiente:

> Si decretado el divorcio por cualesquiera de las causales que establece la sec. 321 de este título, cualesquiera de los excónyuges no cuenta con suficientes medios para vivir, el Tribunal de Primera Instancia podrá asignarle alimentos discrecionales de los ingresos, rentas, sueldos o bienes que sean de la propiedad del otro cónyuge. […]

---

[8] Vigente a la fecha en que acontecieron los hechos que originan la causa de referencia.

Al establecer si procede imponer una pensión de excónyuge y la cuantía de esta, el tribunal debe llevar a cabo una evaluación a la luz de los ocho factores dispuestos en el Artículo 109 del Código Civil, *supra*. Los referidos criterios son los siguientes:

> (a) **Los acuerdos a que hubiesen llegado los excónyuges**; (b) la edad y el estado de salud; (c) la cualificación profesional y las probabilidades de acceso a un empleo; (d) la dedicación pasada y futura a la familia; (e) la colaboración con su trabajo en las actividades mercantiles, industriales o profesionales del otro cónyuge; (f) la duración del matrimonio y de la convivencia conyugal; (g) el caudal y medios económicos y las necesidades de uno y otro cónyuge; (h) cualquier otro factor que considere apropiado dentro de las circunstancias del caso. Véase, además, Díaz v. Alcalá, 140 DPR 959, 977-978 (1996).

Destacamos que las pensiones alimentarias de excónyuges están investidas del mayor interés público. *Cortés Pagán v. González Colón*, 184 DPR 807, 814 (2012). Además, los "dictámenes sobre pensiones alimentarias de excónyuges siempre están sujetos a modificación, según cambie sustancialmente la capacidad del alimentante para proveer alimentos o la necesidad del alimentista". *Íd.*; *Cantellops v. Cautiño*, 146 DPR 791, 806 (1998). De acuerdo con ello, el Código Civil de 1930 establece lo siguiente:

> Fijada la pensión alimenticia, el juez podrá modificarla **por alteraciones sustanciales en la situación, los ingresos y la fortuna de uno u otro ex cónyuge**. La pensión será revocada mediante resolución judicial si llegase a hacerse innecesaria, o por contraer el cónyuge divorciado acreedor a la pensión nuevo matrimonio o viviese en público concubinato. Art. 109 del Código Civil, *ante*. (Énfasis provisto).

Ahora bien, las estipulaciones sobre una pensión alimentaria tienen la naturaleza de un contrato de transacción judicial que obliga a las partes. *Nater v. Ramos*, 162 DPR 616, 627 (2004); *Igaravidez v. Ricci*, 147 DPR 1, 5 (1998); *Ex parte Negrón Rivera y Bonilla*, 120 DPR 61, 76 (1987); *Magee v. Alberro*, 126 DPR 228, 232-233 (1990). Lo anterior, debido a que dichas estipulaciones ponen fin a un litigio e incorporan unos acuerdos en el proceso judicial en curso. *Íd.* Como norma general, el TPI aceptará estos convenios y

estipulaciones, los cuales tendrán el efecto de cosa juzgada entre las partes. *Rivera Rodríguez v. Rivera Reyes*, 168 DPR 193, 205 (2006); *Magee*, 126 DPR a la pág. 232.

No obstante, no procede aplicar una regla absoluta de no modificar las pensiones estipuladas debido a que se trató de un contrato de transacción. *Magee*, 126 DPR a la pág. 233. En estos casos, el tribunal deberá velar porque lo estipulado confiera protección adecuada a las partes. *Íd.* Destacamos que, en *Magee*, 126 DPR a la pág. 234, se puntualizó que los excónyuges que de buena fe confían y aceptan una estipulación sobre pensión se encuentran prácticamente en la misma posición que los menores cuya pensión también es objeto de una estipulación.

En conexión, en lo atinente a las pensiones estipuladas, "la doctrina ha establecido que la alteración del convenio o estipulación sobre pensión alimenticia en ocasión de un divorcio procederá solamente cuando exista un cambio sustancial en las circunstancias que dieron lugar u originaron el mismo. No basta cualquier cambio en las circunstancias, tiene que ser uno sustancial." *Ex Parte Negrón Rivera*,120 DPR a la pág. 77.

III.

Al ejercer nuestra función revisora le debemos deferencia a las determinaciones de hechos que hace el juzgador de primera instancia, en particular a aquellas que descansan sobre su apreciación de la credibilidad de testigos. *Dávila Nieves v. Meléndez Marín*, 187 DPR 750, 770-772 (2013); *González Hernández v. González Hernández*, 181 DPR 746, 776-777 (2011). Es dicho juzgador (en este caso, el TPI) quien está en mejor posición para evaluar la prueba, ya que tiene la oportunidad de escuchar a los testigos mientras declaran y de observar su comportamiento. *Íd*; *E.L.A. v. S.L.G. Negrón-Rodríguez*, 184 DPR 464, 486 (2012); *Serrano Muñoz v. Auxilio Mutuo*, 171 DPR 717, 741 (2007).

Los foros apelativos solo podemos intervenir con la apreciación de la prueba oral que haga el juzgador de los hechos cuando éste haya actuado con pasión, prejuicio o parcialidad, o haya incurrido en un claro error al aquilatarla. *Dávila Nieves*, 187 DPR a la pág. 771; *González Hernández*, 181 DPR a las págs. 776-777; *Rivera Figueroa v. The Fuller Brush Co.*, 180 DPR 894, 916 (2011); *Meléndez v. Caribbean Int'l. News*, 151 DPR 649, 664 (2000). Se podrá intervenir cuando la apreciación de la prueba no represente el balance más racional, justiciero y jurídico de la totalidad de la prueba y cuando la apreciación de la misma se distancia "de la realidad fáctica o sea inherentemente imposible o increíble". *Pueblo v. Santiago et al.*, 176 DPR 133, 148 (2009).

IV.

Concluimos que actuó correctamente el TPI al rechazar la solicitud de relevo de la Pensión. Examinado detenidamente el récord, incluida la transcripción de la prueba, se sostiene ampliamente la conclusión del TPI a los efectos de que no se demostró la existencia de cambios sustanciales en la situación de ambos que pudiesen ameritar el relevo de la Pensión. Veamos.

Como cuestión de umbral, y como cuestión de derecho, los planteamientos principales del Apelante no tienen pertinencia alguna, pues tratan sobre **asuntos que ya este conocía cuando estipuló la Pensión**, no de "cambios" imprevisibles, mucho menos "sustanciales", en las circunstancias de las partes. Por ello no tiene peso alguno lo relacionado con la cuantía recibida por la Apelada como parte de la liquidación de gananciales, ni que su hijo haya terminado sus estudios, ni que la Apelada cuente con estudios universitarios o "pueda trabajar", y no esté incapacitada.[9] Tampoco

---

[9] Transcripción de la prueba oral ("TPO"), vista 12 de abril de 2021, pág. 168, líneas 15-24. Véase, además, *Minuta* de vista de 25 de abril de 2021, en la cual consta lo siguiente:
A preguntas sobre la razón por qué se solicita el relevo del pago de pensión a la señora Rivera, el señor Pérez confirma que en la deposición manifestó que

tiene pertinencia los activos con los que cuenta la Apelada, pues no se alega que estos fueran desconocidos por el Apelante al estipularse la Pensión.

En efecto, al momento de decretarse el divorcio y de estipularse la Pensión, la Exesposa tenía los mismos estudios universitarios que ahora, no estaba buscando trabajo fuera del hogar, no estaba incapacitada y contaba con el dinero que le fue adjudicado al dividirse la sociedad legal de gananciales. Es decir, las circunstancias particulares de la Exesposa eran conocidas por las partes y coetáneas al momento de estipularse la Pensión.

De hecho, el Apelante implícitamente admitió que su solicitud no responde realmente a algún cambio sustancial cuando indicó que entendía que la Pensión se pagaría solamente por dos años y que, realmente, en su opinión, la Exesposa "nunca ha tenido derecho a la pensión".[10] Adviértase, no obstante, que no hay controversia sobre el hecho de que la Pensión se estipuló de forma indefinida y que no se acordó ninguna fórmula o condición de terminación de la misma.[11] De conformidad, de la sentencia de divorcio lo único que se desprende es que el TPI acogió el acuerdo entre las partes sin límite de tiempo y sin otras condiciones como lo serían buscar empleo, la culminación de los estudios universitarios del hijo o una duración por un tiempo determinado.

Así pues, aunque el Exesposo afirmó que, según su mejor entendimiento, debería pagar la Pensión únicamente por dos (2) años, lo cierto es que dicha condición no consta en las estipulaciones de la sentencia de divorcio, ni en la Minuta de la vista correspondiente. Tampoco consta en la estipulación que la Pensión

---

entendía que habían acordado que él pagaría la pensión hasta que su hijo terminara estudios universitarios. En la deposición también manifestó que detuvo el pago por que están en el proceso legal y que la señora Rivera puede trabajar porque no esta incapacitada. Apéndice XVI, pág.167.

[10] TPO, vista del 12 de abril de 201, pág. 169, líneas 1-7; TPO, vista del 12 de abril de 2021, pág. 69, líneas 11-18.

[11] Véase, TPO, vista de 12 de abril de 2021, pág. 282, líneas 4-9.

era para ayudar a la manutención de su hijo, quien, aunque adulto, era estudiante universitario en ese momento. Tampoco se acordó que la Exesposa tendría la obligación de buscar trabajo fuera del hogar. Ambas partes estuvieron conformes con la estipulación y, luego, ninguno solicitó su revisión o reconsideración.

Contrario a lo planteado por el Apelante, no se demostró que la Apelada hubiese acordado que la Pensión únicamente estaría vigente mientras el hijo estudiaba. El correo electrónico en el cual descansa el Apelante para apoyar esta teoría lo único que demuestra es la aprehensión de la Exesposa en términos de cuándo el Exesposo solicitaría el relevo (la Apelada solicitó que no fuese mientras todavía estudiaba el hijo de las partes).[12] Como bien apreció el TPI, dicha comunicación lo que revela es la preocupación de la Exesposa por el impacto de la acción de referencia en su situación económica.[13] De modo alguno puede interpretarse como una admisión de la Exesposa sobre algún tipo de acuerdo en cuanto a la duración de la Pensión.

Por su parte, tampoco se demostró que los ingresos actuales de la Apelada representen un cambio sustancial en sus circunstancias que amerite una modificación de la Pensión. No surge del récord que la venta de prendas o de productos *Mary Kay* haya tenido un impacto significativo, mucho menos sustancial, sobre la situación financiera de la Exesposa.

En cambio, lo que surge del récord es que, desde que el Exesposo dejó de pagar la Pensión y el plan médico, contrario a la obligación que voluntariamente asumió ante el TPI, la Exesposa no ha contado con los recursos suficientes para sufragar sus gastos y

---

[12] En lo pertinente, la Exesposa expresó lo siguiente:
"Te aseguro que esperaba esta acción después que Iván se graduara de su bachillerato. [...] Te pido si puedes detener este proceso y someterlo dentro de un año pues el impacto y el panorama será diferente". Exhibit 1 promovente, Apéndice XXIX del recurso de apelación, pág. 201.
[13] Véase, Sentencia, Apéndice del recurso de apelación, pág. 113.

que, por esa razón, ha tenido que recurrir a disminuir sus gastos y a utilizar el producto de las ventas antes mencionadas, sus ahorros y un retiro de una cuenta IRA sin penalidad (permitido por la emergencia del COVID-19).

Lejos de demostrar, como sugiere el Apelante, que la Apelada no tiene necesidad económica, la utilización por esta de Programa de Asistencia Nutricional (PAN) y el Plan Vital (Reforma), así como el hecho de que, desde octubre de 2020, reside con familiares en el estado de Florida[14], subraya la realidad de la necesidad económica de la Exesposa así como el impacto de la falta de pago de la Pensión.[15]   Aseverar lo contrario es equivalente a plantear el absurdo de que, como un alimentado dejó de comer (por no recibir una pensión), ya no tiene necesidad de alimentos.

Resaltamos que las partes convivieron durante dieciséis (16) años y estuvieron casados casi veintidós (22) años.  La Exesposa tenía veinte (20) años y era estudiante universitaria cuando se casó con el Exesposo y, aunque terminó estudios cuando ya el hijo de las partes había nacido, lo cierto es que **nunca trabajó fuera del hogar**.[16] Al margen de cómo esto incide en la empleabilidad real de la Exesposa, asunto sobre el cual no se desfiló prueba, lo cierto es que no surge del récord que durante esos años se le cuestionara o exigiera que debía trabajar fuera del hogar.[17]

---

[14] La Exesposa aseveró en corte que vive con su hermano desde octubre de 2020 en Florida porque no tiene para suplirse sus necesidades básicas.  Su hermano le brinda techo, alimento y hospedaje.  TPO, vista del 30 de noviembre de 2022, pág. 9, líneas 1-10; pág. 43, líneas 9-12.

[15] Por ejemplo, en el año 2020, las facturas del servicio de agua potable de la Autoridad de Acueductos y Alcantarillado reflejaron atrasos y cargos por atrasos porque, al no tener la Pensión, la Exesposa sostuvo que no le alcanzaba para pagar.  TPO, vista del 1 de julio de 2022, págs. 145-148.  La Exesposa también tenía un acuerdo de pago con la Autoridad de Energía Eléctrica, para pagar atrasos.  TPO, vista del 17 de octubre de 2022, pág. 17, líneas 1-25.  El servicio de agua potable fue suspendido.  TPO, vista del 17 de octubre del 2022, pág. 236, líneas 9-11.

[16] TPO, vista del 7 de mayo de 2021, pág. 81, líneas 1-14; vista del 22 de junio de 201, pág. 17, líneas 17-23.

[17] Durante el juicio, el Exesposo admitió que la Exesposa no tuvo ingresos desde el 1991 hasta el 2007 cuando se fue del hogar matrimonial.  TPO, vista del 7 de mayo de 201, pág. 121, líneas 14-18.  Véase, además, TPO, vista del 22 de junio de 2021, pág. 17, líneas 13-25, pág. 18., líneas 1-3; TPO, vista del 30 de agosto de 2021, pág. 31, líneas 1-5.

Tampoco tiene razón el Exesposo cuando alega que no se le permitió desfilar prueba sobre su intención de jubilarse. Ello no está apoyado por el récord, pues del mismo no surge que se le impidiese declarar sobre sus "planes de retiro".[18] De hecho, surge de la transcripción de la prueba oral que al Exesposo declaró en torno a sus circunstancias personales a partir del 2018, tales como su segundo matrimonio, sus viajes, cuentas de ahorros, planillas de contribución de ingresos, la venta de una propiedad inmueble, la compra de otra en el 2020, etc. Más importante aún, este asunto no tiene pertinencia, pues el Apelante únicamente descansó en los supuestos cambios en la situación de la Apelada para solicitar el relevo de la Pensión. TPO, 1 de julio de 2022, pág. 32, líneas 22-25. Es decir, en momento alguno ha planteado que no tenga la capacidad para pagar la Pensión.

Nuestra conclusión se fortalece cuando se considera que la prueba demostró que la Apelada renunció a una parte sustancial de lo que tenía derecho en la división de gananciales a cambio del compromiso de que la Pensión se pagaría de forma indefinida e incondicional. En efecto, la Exesposa declaró que la Pensión fue un acuerdo para ella "no tocar" la compañía de seguros, Alternative Insurance, Inc., que fundó el Exesposo mientras las partes todavía estaban casadas entre sí.[19] El récord sustenta esta aseveración de la Apelada, pues de las estipulaciones de las partes para dividir la sociedad legal de gananciales no surge una división al 50% de la totalidad del valor de ese negocio, sino únicamente de los activos que obraban en cuentas bancarias.[20]

---

[18] No consta en autos oferta de prueba ofrecida y no admitida al respecto. Además, de la transcripción de la prueba lo que surge es que la representación legal del Exesposo pretendió desfilar prueba en torno a los planes de retiro durante un contrainterrogatorio y debido a que dicha evidencia no fue parte del directo, no se le permitió presentarla. TPO, pág. 206, líneas 1-13.

[19] TPO, vista del 30 de agosto del 2021, pág. 206, líneas 1-5.

[20] Véase, además, TPO, vista del 7 de mayo de 2021, pág. 120, líneas 8-15.

En fin, como indicáramos previamente, las pensiones alimentarias estipuladas constituyen contrato de transacción judicial. Asimismo, cuando los términos de un contrato son claros y no dejan duda alguna sobre la intención de las partes, se utilizará el sentido literal de sus cláusulas. Véanse, *Guadalupe Solís v. González Durieux*, 172 DPR 676 (2007); *S.L.G. Irizarry v. S.L.G. García*, 155 DPR 713 (2001); *Trinidad v. Chade*, 153 DPR 280 (2001). Aunque lo anterior no implica que las pensiones estipuladas sean eternas, le corresponde a la parte interesada en el relevo demostrar la existencia de un cambio sustancial en las circunstancias de las partes. Aquí, son claros los términos del acuerdo sobre pensión alimentaria suscrito por las partes y acogido por el TPI, y el Apelante no pudo demostrar que haya ocurrido un cambio sustancial en sus recursos económicos o en la necesidad de la Apelada al momento de solicitar el relevo de la Pensión.

V.

Por los fundamentos que anteceden, se confirma el dictamen apelado.

Lo acordó y manda el Tribunal, y lo certifica la Secretaría del Tribunal de Apelaciones.


Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones